IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

NEAL HALEY, SHERRY HALEY, and
CLAYTON DAVIS, on behalf of themselves
and others similarly situated                                    PLAINTIFFS

v.                                        CIVIL ACTION NO. 4:09-CV-00094-GHD-JMV

MERIAL, LIMITED; MERIAL, LLC; and
MERIAL, INC.                                                      DEFENDANTS

## MEMORANDUM OPINION DENYING
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Presently before the Court is Plaintiffs' motion for class certification [248]. Having

carefully considered the motions, responses, replies, class-certification hearing testimony and

exhibits, and parties' supplementations, the Court finds that the motion for class certification

[248] should be denied.

### A. Factual and Procedural Overview

Defendants Merial, Limited and Merial, LLC manufacture, market, and sell HeartGard

and HeartGard Plus, heartworm preventatives for dogs administered monthly in the form of beef-

flavored chewable tablets containing the active ingredients ivermectin and pyrantel. Merial

apparently sells HeartGard and HeartGard Plus at wholesale prices to veterinarians, who set the

retail prices of the drugs, and then prescribe the drug to particular dogs, whose owners

administer the doses to the dogs.

Plaintiffs Neal Haley, Sherry Haley, and Clayton Davis ("Plaintiffs")[1] bring this putative

---

[1] On March 9, 2011, Plaintiffs filed a motion for the voluntary dismissal [198] of three of the Plaintiffs named in the complaint. "The decision was made in order to best prosecute the claims of the remaining Plaintiffs (Neal Haley, Sherry Haley and Clayton Davis) while protecting the interests of putative class members, and in the interest of judicial economy by making the case as straightforward and simple as possible." Pls.' Mot. Voluntary Dismissal [198] ¶ 4. The Court entered an Order [226] granting the motion as unopposed and dismissing the specified named Plaintiffs from the case.

RICO class action against Merial alleging that their dogs and a multitude of other dogs have contracted heartworms, despite their reliance on HeartGard or HeartGard Plus, which are marketed as heartworm preventatives.[2] Plaintiffs assert that Merial initially marketed HeartGard and HeartGard Plus as 100% effective against heartworms despite Merial's actual knowledge that such efficacy claims were false.[3] Plaintiffs further assert that the lack of effectiveness of HeartGard and HeartGard Plus became apparent once numerous post-approval adverse drug events were reported. Plaintiffs allege that Merial's actions constitute violations of RICO, certain provisions of the Federal Food, Drug, and Cosmetic Act (the "FDCA"), and 18 U.S.C. §§ 1341 and 1343.

Although Merial disputes most of the Plaintiffs' allegations against them—including that Merial ever engaged in false or fraudulent conduct, or that it engaged in any scheme to defraud veterinarians, pet care professionals, American consumers, or Plaintiffs—the following facts apparently are not in dispute: The Food and Drug Administration (the "FDA") approved HeartGard and HeartGard Plus for use in dogs to help prevent canine heartworm disease and for the treatment and control of ascarids and hookworms. Prior to the time Plaintiffs filed their initial complaint, Merial distributed promotional and/or marketing material related to HeartGard and HeartGard Plus to veterinary clinics throughout the United States wherein Merial represented that HeartGard and HeartGard Plus were 100% effective against heartworms. The

---

[2] In the original complaint, Plaintiffs sought damages for eight stated causes of action: fraud; breaches of express and implied warranties under the Uniform Commercial Code; breach of written warranty under the Magnusson-Moss Act; racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; unjust enrichment; constructive trust; and injunctive relief. After Merial filed a motion to dismiss the Magnusson-Moss written warranty claims and the RICO violations claims, the Court dismissed the Magnusson-Moss written warranty claims and sustained the RICO claims. Thereafter, Plaintiffs were granted leave to amend their complaint to plead only the RICO claim.

[3] Merial argues that its "100% efficacy" claims were supported by research and that other brand-name and generic heartworm preventative market competitors also advertised and promoted their drugs as "100% effective" against heartworms.

FDA subsequently sent Merial and its competitors letters requesting that the drug manufacturers stop promoting the heartworm preventatives as 100% effective and modify their labels. In 2005, the FDA sent Merial a letter repeating its request that Merial discontinue promotion and advertising activities claiming 100% effectiveness at heartworm prevention.[4] In 2006, the FDA sent Merial warning letters stating that Merial had promotional material on websites regarding HeartGard and HeartGard Plus which overstated the efficacy of the drugs and constituted misbranding in violation of federal law.[5] The FDA instructed Merial to present to the FDA a comprehensive plan for correcting the false impressions given to the public about the effectiveness of the drugs. In 2007, the FDA sent Merial a letter stating that a Merial ad had overstated the effectiveness of HeartGard and HeartGard Plus with respect to preventing and controlling zoonotic diseases. Merial agreed to remove certain language from promotional materials concerning the 100% effectiveness of HeartGard and HeartGard Plus. The parties apparently agree that Merial has never specifically instructed veterinarians' offices to remove the advertising and promotional materials containing the 100% efficacy claims.

Plaintiffs allege that despite receiving warning letters from the FDA concerning the marketing and promotion of HeartGard and HeartGard Plus as 100% effective at heartworm prevention, Merial continued and even strengthened its deceptive advertising, until Merial finally agreed to discontinue promotion and advertising 100% efficacy for HeartGard and HeartGard Plus. Plaintiffs allege that although Merial apparently amended some of its promotional material to remove "100%," Merial took no other action to correct the impression of 100% effectiveness

---

[4] Merial maintains that all brand-name and generic heartworm preventative market competitors were given the same warnings by the FDA.

[5] Merial maintains that it does not engage in internet sales and thus has limited control over any "100% effective" claims that may appear on third-party websites.

previously given to nationwide veterinarians, pet care professionals, and dog owners. Plaintiffs aver that Merial continues to benefit from fraudulent advertisements that have been placed on the Internet either by Merial or by others who sell Merial's products with Merial's knowledge.

Plaintiffs further allege that Merial engaged in the practice of employing fraudulent scare tactics to encourage sales of HeartGard and HeartGard Plus to prevent the transmission of certain zoonotic diseases from dogs to humans, including certain diseases caused by roundworms and hookworms in its advertising and promotion of HeartGard and HeartGard Plus. Plaintiffs aver that despite the FDA's warnings with respect to the claims of 100% effectiveness in preventing the transmission of certain zoonotic diseases to humans, Merial continues to furnish veterinarians and other pet care professionals with false promotional materials that remain on display in veterinarians' offices for consumers to review.

Plaintiffs allege the following facts in support of their claims: Named Plaintiffs Neal and Sherry Haley (the "Haleys") have two dogs, a chocolate Labrador retriever named Mack and a rat terrier named Buddy. Mack contracted heartworms while on a different heartworm preventative medication than HeartGard Plus. After Mack was treated for heartworms, the Haleys consulted with their veterinarian concerning a change of medication for Mack to prevent another infestation of heartworms. Mack's veterinarian recommended that the Haleys change Mack's heartworm medication to HeartGard Plus, because it was guaranteed to be 100% effective against heartworms. Neal Haley reviewed some of the promotional material in the veterinarian's office, and comforted by the claims of 100% efficacy, agreed to place Mack on a regimen of monthly doses of HeartGard Plus in February of 2006—even though HeartGard Plus was more expensive than Mack's previous heartworm medication. Mack tested negative for heartworms in August of 2006. Although Neal Haley administered the doses of HeartGard Plus

4

to Mack in full and complete compliance with the instructions from Merial, Mack contracted and tested positive for heartworms in February of 2009, while on HeartGard Plus. Neal Haley testified at the class-certification hearing that he decided not to put Mack through heartworm treatment, because of what Mack had gone through during heartworm treatment while Mack was on the previous heartworm preventative, and also due to Mack's advanced age and his veterinarian's advice concerning the same.

Later, in August of 2007, the Haleys acquired a second dog, Buddy, who was a rat terrier. Buddy tested negative for heartworms. Neal and Sherry Haley began giving Buddy HeartGard Plus in approximately August of 2007, in reliance of the 100% efficacy claims with respect to HeartGard Plus. Although Neal Haley administered the doses of HeartGard Plus to Buddy in full and complete compliance with the instructions from Merial, Buddy contracted heartworms in August of 2008, while on HeartGard Plus. Neal Haley testified at the class-certification hearing that he decided not to put Buddy through heartworm treatment, and that Buddy is still alive.

Named Plaintiff Clayton Davis has three dogs named Duke, Haus, and Jazz. Based on his veterinarian's recommendations and the assurances made by Merial's advertisements and promotions concerning the 100% efficacy of HeartGard Plus, Davis chose to place all three of his dogs on a strict regimen of HeartGard Plus in accordance with the manufacturer's directions from the time the three dogs were several months old. In June of 2006, Duke tested positive for heartworms. After Duke was treated for heartworms, he was then placed on a twice-monthly regimen of Interceptor and HeartGard Plus. Haus and Jazz both tested positive for heartworms in May of 2007. Following this positive test, both Haus and Jazz were treated for heartworm infection and were then placed on a twice-monthly regimen of Interceptor and HeartGard Plus— just like Duke. Nevertheless, all three dogs once more contracted heartworms. The dogs have

5

been treated again, and are now on a different heartworm medication than HeartGard Plus.

The named Plaintiffs bring this action on behalf of a putative class called "the drug purchase class," which would be composed of "[a]ll individuals who purchased HeartGard or HeartGard Plus from and after September 1, 2005, until the date upon which Merial ceases making, or causing to be made, false claims regarding 100% efficacy, and false claims regarding transmission of zoonotic diseases in humans, excluding any members who have taken bankruptcy."[6] Pls.' Suppl. Br. Supp. Mot. Class Certification [335] at 1–2 (citing Pls.' Am. Compl. [81] ¶ 60). Plaintiffs maintain that their intent is to include as class members only those consumers who paid retail price for HeartGard or HeartGard Plus in purchasing the drugs either from their particular veterinarians or over the Internet. Plaintiffs allege that they have suffered monetary and emotional damages as a result of their reliance on HeartGard or HeartGard Plus for heartworm prevention, because their dogs have contracted heartworms and may not survive treatment. Plaintiffs seek actual damages including, but not limited to, the following:

> the prices paid by the [P]laintiffs to purchase HeartGard and HeartGard Plus since the inception of the false advertisements and false promotional materials; costs incurred by the [P]laintiffs resulting from the failures of HeartGard and HeartGard Plus, and the amounts by which [Merial] has been unjustly enriched at the [P]laintiffs' expense by false and fraudulent advertising and promotional claims of excessive efficacy; . . . divestiture of any and all of [Merial]'s interest in the enterprise . . . ; [t]reble damages, costs[,] and attorney's fees and expenses . . . ; and [d]ivestiture of all proceeds received from the sale of HeartGard and/or HeartGard Plus for dogs to the extent to which [Merial has] been unjustly enriched at the Plaintiffs' expense.

Pls.' Am. Compl. [81] ¶¶ 2–5. Plaintiffs additionally seek punitive and exemplary damages and

---

[6] In the amended complaint, Plaintiffs refer to a proposed "drug class" subclass [all members of "Drug Purchase" class whose dog(s) experienced failure of drug to perform as advertised]. However, Plaintiffs state in their motion to certify class that they no longer wish to have this certified as a subclass: "During [the class-certification stage,] much proof has been developed regarding whether the cause of an individual dog's heartworm disease was the result of drug failure, or the dog owner's failure to properly administer the drug. Plaintiffs[] concede that . . . individualized proof would be required in each instance"; accordingly, Plaintiffs no longer seek certification of the "drug class" subclass. Pls.' Br. Supp. Mot. Certify Class [253] at 2 n.7.

any other legal or equitable relief deemed just under the circumstances. *Id.* ¶¶ 6–7.

### *B. Class-Certification Standard*

Plaintiffs maintain that their RICO case should be certified as a class action under Rule 23 of the Federal Rules of Civil Procedure. The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979). "Class actions promote efficiency and economy in litigation and permit multiple parties to litigate claims that otherwise might be uneconomical to pursue individually." *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010); *see Credit Suisse Sec. (USA) LLC v. Simmons*, __ U.S. ___, 132 S. Ct. 1414, 1419 n.6, 182 L. Ed. 2d 446 (Mar. 26, 2012) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974) ("efficiency and economy of litigation" is "a principal purpose" of class actions)).

The district court has "wide discretion" in determining whether to certify a class. *Allard v. Anderson*, 260 F. App'x 711, 716 (5th Cir. 2007) (citing *McGrew v. Tex. Bd. of Pardons & Paroles*, 47 F.3d 158, 162 (5th Cir. 1995)). However, "[a] district court must rigorously analyze Rule 23's prerequisites before certifying a class." *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 345 (5th Cir. 2012) (internal citation omitted). "This requires an understanding of 'the relevant claims, defenses, facts, and substantive law presented in the case,' " *id.* at 345–46 (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998)), and often "entail[s] some overlap with the merits of the plaintiff's underlying claim . . . that cannot be helped," *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2551–2552, 180 L. Ed. 2d 374 (June 20, 2011) (internal quotation marks and citations omitted).

Class certification is only appropriate if the Court is satisfied after conducting a rigorous analysis that the party seeking class certification has met its burden of demonstrating that (1) all four general class action prerequisites of Rule 23(a) are met, and (2) that the action is maintainable under one of the three categories set forth in Rule 23(b). *See In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007).

### C. Rule 23(a) Prerequisites

The putative class must first meet the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure which provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
>> (1) the class is so numerous that joinder of all members is impracticable;
>>
>> (2) there are questions of law or fact common to the class;
>>
>> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>>
>> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

### (1) Numerosity

The first requirement of Rule 23(a) is that the class must be so numerous that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of N.W., Inc. v. EEOC*, 446 U.S. 318, 330, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980).

8

Plaintiffs, all adult citizens of Mississippi, maintain that the putative "drug purchase class" of dog owners who purchased HeartGard or HeartGard Plus from September 1, 2005 "until the date upon which Merial ceases . . . [its] false claims regarding 100% efficacy" against heartworms and the transmission of zoonotic diseases to humans, will have in excess of 4 million class members. Plaintiffs maintain in support of numerosity that Merial has admitted that more than 40 million doses of HeartGard Plus have been sold in the United States since September 1, 2005, and further that Merial has allegedly produced more than 10,000 notices of adverse drug events related to the failure of HeartGard to prevent heartworm infestation despite administering HeartGard to the particular dog as directed. *See* Pls.' Suppl. Br. Supp. Mot. Class Certification [335] at 3. Thus, Plaintiffs contend that the class is so numerous that joinder of all members is impracticable. The Court finds that Plaintiffs have satisfied the numerosity requirement.

### (2) **Commonality**

The second requirement of Rule 23(a) is that there must be at least one question of law or fact common to the class. FED. R. CIV. P. 23(a)(2). The United States Supreme Court stated in *Dukes* that the mere recitation of common questions among the class members, which occurs in "[a]ny competently crafted class action complaint," is not sufficient to obtain class certification. *Dukes*, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131–32 (2009)). Commonality requires the plaintiff to demonstrate not only that the class members "have all suffered a violation of the same provision of law," but that they "have suffered the same injury" such that "all [of the class members'] claims can productively be litigated at once." *Id.* (internal citation omitted; emphasis added). The commonality requirement is not met "when the proposed class merely establishes that there is at least one issue whose resolution will affect all or a significant number of the putative class

9

members." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (internal citation omitted). "Rather, Rule 23(a)(2) requires that all of the class member's claims depend on a common issue of law or fact whose resolution 'will <u>resolve</u> an issue that <u>is central to the validity</u> of each one of the [class member's] claims in one stroke.' " *Id.* (citing *Dukes*, 131 S. Ct. at 2551). An example of a question that could satisfy Rule 23(a)'s commonality requirement is one which "invite[s] a 'yes' or 'no' answer." *See Ahmad v. Old Republic Nat'l Title Ins. Co.*, 690 F.3d 698, 704 (5th Cir. 2012) (internal citation omitted).

Plaintiffs argue that they have satisfied commonality, as the predominant issues in this case are the same for all class members: that is, Merial's alleged violations of RICO, the FDCA, federal mail fraud statutes, and federal wire fraud statutes. Plaintiffs maintain that the specific questions raised in the case are the following:

> **(1)** Has Merial engaged in a pattern of racketeering activity?
> **(2)** Has Merial engaged in RICO "predicate acts" by using the mail and wire to disseminate false and misleading advertisements?
> **(3)** Did Merial market HeartGard as 100[%] effective while knowing this claim was false?
> **(4)** Did Merial receive and retain monies due to false and misleading statements contained within its marketing materials?
> **(5)** Did Merial continue to disseminate deceptive marketing information to class members after being told by the FDA to cease dissemination of such materials?
> **(6)** Has Merial conducted or participated in a RICO enterprise?
> **(7)** Has Merial's pattern of racketeering activity, through its false marketing campaign, injured class members, including the named [P]laintiffs, in their "business or property"?
> **(8)** Have Merial's deceptive practices caused class members to pay more for HeartGard despite it not providing any more protection against heartworm disease than less expensive competing products?
> **(9)** What injunctive or declaratory relief is required to enjoin and otherwise remedy Merial's false marketing of HeartGard?

Plaintiffs' Suppl. Br. Supp. Mot. Class Certification [335] at 4. Plaintiffs further maintain that "the very gravamen of the RICO claims is the pattern of racketeering activity and the existence of a national conspiracy," which "constitute essential elements of each plaintiff's RICO claims." *Id.* at 17 (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009)). Plaintiffs maintain that questions concerning whether Merial has continued to distribute its products through websites that post HeartGard advertisements, and whether Merial has failed to abide by the FDA's warning concerning its efficacy claims of HeartGard and HeartGard Plus, are questions common to the class. Finally, Plaintiffs maintain that "[t]he alleged existence and operation of a nationwide corporate[-]level policy" satisfies commonality. *Id.* at 19.

Merial argues that Plaintiffs have failed to satisfy commonality, as key questions in the case are anything but common to the putative class members, and instead are individualized issues, such as issues concerning the pricing of the drug that would vary from veterinarian to veterinarian and from Plaintiff to Plaintiff.

As stated above, the recitation of questions—even if they are important questions to be answered in the course of litigation on the RICO claim—alone does not satisfy commonality. Instead, the Court looks to see if the Plaintiffs have suffered the same injury and that the Plaintiffs' claims depend upon a common contention whose truth or falsity will be established, and when established, will resolve a central issue in one stroke. The Court finds that some of the questions focused on Merial's alleged participation in a RICO enterprise clearly satisfy the commonality requirement. These questions include whether Merial engaged in a pattern of racketeering activity, engaged in "predicate acts" by using the mail and wire to disseminate false and misleading advertisements, and marketed the drugs as 100% effective while knowing these claims were false. The answer to any of these questions is common among the class members,

11

and answers would decide an issue that is central to the RICO claim of every putative class member at the same time. For example, the answer of "yes" or "no" to whether Merial engaged in "predicate acts" by using the mail and wire to disseminate false and misleading advertisements of 100% efficacy would resolve that integral question in the RICO claim for all putative class members in one stroke. These common questions would "generate common <u>answers</u> apt to drive the resolution of the litigation," *see Dukes*, 131 S. Ct. at 2551, and thus, the Court finds that Plaintiffs have satisfied the commonality requirement.

### (3) Typicality

The third requirement of Rule 23(a) is that the plaintiff's claims must be typical of the claims of the class. FED. R. CIV. P. 23(a)(3). The United States Supreme Court stated in *Dukes*: "We have previously stated . . . that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 131 S. Ct. at 2551 n.5 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157–58 n. 13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

Plaintiffs maintain that their claims are typical of the claims of the putative class in that the proof of racketeering activity would be the same whether this were an individual plaintiff's RICO action or class action, and this consumer protection issue is well suited for a class action. Plaintiffs specifically allege in this respect that

> (1) Merial's advertisements were designed to and did in fact exaggerate the effectiveness of the drug to veterinarians and dog owners alike in a deceptive manner;
>
> (2) Merial knew that its product did not provide 100[%] protection against heartworms as advertised, yet intended for the false

12

statements to justify price difference between it and the generics;

(3) The claims of excessive effectiveness elevated the desirability of the drugs in the minds of the veterinarians causing them as a whole to recommend HeartGard over its competitors;

(4) Each class member purchased Merial's products, paying more money per dose for a product that was advertised to "Provide 100% Protection Against Heartworm Disease," when in reality Merial's products provided no more protection against heartworm disease than Merial's competitors' less expensive products; [and]

(5) The claims of the proposed class representatives and of the putative class arise from a similar course of conduct and share the same legal theories.

Pls.' Suppl. Br. Supp. Mot. Class Certification [335] at 6–7 (internal footnotes and citations omitted).

Merial argues that there is a lack of typicality among the named Plaintiffs and absent putative class members, and maintains in support that testimony at the class-certification hearing indicated that one of the named Plaintiffs viewed the "100% effectiveness" statement, and one did not view the statement prior to purchasing HeartGard Plus; one was informed by his veterinarian that HeartGard Plus was 100% effective, and one was not informed of the same; and one relied in part on his veterinarian's recommendation, while one relied solely on his veterinarian's recommendation. The Court finds that despite these possible discrepancies, Plaintiffs have demonstrated that their claims are typical of the putative class. Thus, the Court finds that Plaintiffs have satisfied the typicality requirement.

### (4) Adequate Representation

The fourth requirement of Rule 23(a) is that the representative parties must "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "Because absent class members will be bound by the judgment in a class action law suit, strict review of the adequacy of representation is required." *Dodson v. Hillcrest Sec.*, 95 F.3d 52, 1996 WL 459770, at *6 (5th

Cir. 1996); *see Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977). The adequate representation requirement is satisfied if "(1) the [proposed] representative [has] common interests with the unnamed members of the class; and (2) it . . . appear[s] that the [proposed] representative will vigorously prosecute the interests of the class through qualified counsel." *Dodson*, 1996 WL 459770, at *6 (citing *Gonzales v. Cassidy*, 474 F.2d 67, 72 (5th Cir. 1973)).

Plaintiffs maintain that the class representatives will fairly and adequately protect the interests of the class, as Plaintiffs' counsel will prosecute the action zealously and competently and have substantial litigation experience and familiarity with the particular issues in the case; to date, Plaintiffs' counsel have competently and vigorously maintained the suit by undertaking extensive written discovery, taking and defending a number of depositions in at least seven states, engaging in extensive motion practice, and litigating the recent class-certification hearing; the named Plaintiffs possess a sufficient level of knowledge about the litigation, as they each own one or more dogs for which they purchased HeartGard Plus based on the efficacy claims and allegedly paid more per dose for HeartGard Plus than they would have paid for a less expensive product of equal protection; the named Plaintiffs have taken an active role in the litigation, as evidenced by their efforts in responding to discovery, appearing for depositions, and traveling across the State of Mississippi to testify at the recent class-certification hearing; and no conflict of interest exists between the named Plaintiffs and absent putative class members. Pls.' Suppl. Br. Supp. Mot. Class Certification [335] at 22–23. Although Merial offers several arguments against adequate representation, the Court is satisfied that Plaintiffs have demonstrated that the representative parties would fairly and adequately protect the interests of the class. Having found that the Plaintiffs have satisfied the four prerequisites of Rule 23(a), the

Court now must determine whether the Plaintiffs' putative class fulfills at least one requirement of Rule 23(b).

### D. Rule 23(b) Class-Certification Criteria

Because Plaintiffs have met the prerequisites of Rule 23(a), the Court must determine whether Plaintiffs' putative class may be certified under Rule 23(b). To obtain class certification, a plaintiff must show the Court that certification is proper under one of the Rule 23(b) criteria. Plaintiffs have moved to have the putative class certified under Rule 23(b)(2) or Rule 23(b)(3).

Rule 23(b) provides in pertinent part:

> A class action may be maintained if Rule 23(a) is satisfied and if:
>
> . . .
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b).

## Rule 23(b)(2) Certification

Plaintiffs maintain that certification is proper under Rule 23(b)(2). Rule 23(b)(2) provides that class certification is proper when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). To satisfy Rule 23(b)(2), a plaintiff must show that "(1) the defendant's actions or refusal to act are generally applicable to the class as a whole and (2) injunctive relief predominates over damages sought." *In re Rodriguez*, 695 F.3d at 365 (citing *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975 (5th Cir. 2000) (internal footnote and citation omitted)).

The Court must be satisfied that the defendant's unlawful conduct has harmed the class members "in essentially the same way," *see Maldonado*, 493 F.3d at 524, that is, that there was "common behavior by the defendant towards the class," *see Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 198 (5th Cir. 2010). The Court simultaneously must be satisfied that "the relief sought [would] perforce affect the entire class at once." *See Dukes*, 131 S. Ct. at 2558. "[I]f relief specifically tailored to each class member would be necessary to correct the allegedly wrongful conduct of the defendant," Rule 23(b)(2) would not be an appropriate class-certification vehicle. *Perry*, 675 F.3d at 847 (citing *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008)). "The key to the [Rule 23](b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 131 S. Ct. at 2557 (quoting Nagareda, 84 N.Y.U. L. REV. at 132). The Supreme Court has explained:

> Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It

> does not authorize class certification when each individual class
> member would be entitled to a <u>different</u> injunction or declaratory
> judgment against the defendant. Similarly, it does not authorize
> class certification when each class member would be entitled to an
> individualized award of monetary damages.

*Id.* "Rule 23(b)(2) anticipates cases such as "[c]ivil rights cases against parties charged with

unlawful, class-based discrimination." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117

S. Ct. 2231, 138 L. Ed. 2d 689 (1997) (citing FED. R. CIV. P. 23 advisory committee's note, 28

U.S.C. App. 696, 697); *see Casa Orlando Apartments*, 624 F.3d at 200–01 ("While [Rule 23]

(b)(2) classes are not exclusively reserved for civil rights disputes, this class type is especially

suited for those plaintiffs.").

The Court notes that, as Merial argues, it is unlikely that injunctive relief is even

available to the Plaintiffs in this RICO action. RICO contains a private right of action providing

in pertinent part that "[a]ny person injured in his business or property by reason of a violation of

section 1962 of this chapter may sue therefor in any appropriate United States district court and

shall recover threefold the damages he sustains and the cost of the suit, including a reasonable

attorney's fee." 18 U.S.C. § 1964(c). This statutory language explicitly refers to the possibility

of monetary relief in a RICO action, but is silent as to the possibility of injunctive relief in a

RICO action. Case law does not shed any further light on the issue. The Fifth Circuit "has not

decided whether equitable relief is available to a private civil RICO plaintiff." *Richard v.

Hoechst Celanese Chem. Gp., Inc.*, 355 F.3d 345, 354 (5th Cir. 2003) (citing *Price v. Pinnacle

Brands*, 138 F.3d 602, 605 n.5 (5th Cir. 1998)). However,

> [t]here is considerable doubt that injunctive relief is available to
> private plaintiffs under RICO. *See Conkling v. Turner*, 18 F.3d
> 1285, 1296 n.8 (5th Cir. 1994) (listing cases). The only court of
> appeals to directly address this issue has held that RICO does not
> allow private injunctive relief, *see Religious Technology Ctr. v.
> Wollersheim*, 796 F.2d 1076, 1082-89 (9th Cir. 1986), and we have

17

> agreed in dicta. *See In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988) ("We find the analysis contained in the *Wollersheim* opinion persuasive . . . . We need not decide, however, whether all forms of injunctive or other equitable relief are foreclosed to private plaintiffs under RICO.").

*Bolin*, 231 F.3d at 977 n.42.

However, even if injunctive relief is allowed in a RICO action, the Court finds that class certification under Rule 23(b)(2) would be improper in this particular case, because injunctive relief does not predominate over the monetary damages sought by Plaintiffs. The Court also notes the presence of separation-of-powers concerns that granting any of the equitable relief sought would potentially usurp the powers of the FDA to police such conduct.

Plaintiffs maintain that the class should be certified under Rule 23(b)(2), because the class is a cohesive unit harmed in the same ways by Merial's systematic and uniform false marketing of HeartGard and HeartGard Plus. Plaintiffs request both monetary and injunctive relief in this case, but maintain that injunctive remedies would provide the most appropriate relief for the class members' common injury. Plaintiffs specifically maintain that the following injunctive relief would be proper: (i) a permanent injunction preventing Merial from marketing HeartGard and HeartGard Plus as 100% effective at heartworm prevention and as 100% effective at preventing the transmission of zoonotic diseases in humans; (ii) a mandatory injunction requiring Merial to recall from veterinarians' offices all marketing material stating the foregoing; (iii) a mandatory injunction prohibiting Merial from knowingly selling or otherwise providing HeartGard and HeartGard Plus to any Internet seller or other person or entity which advertises or promotes HeartGard and HeartGard Plus as 100% effective at heartworm prevention or 100% effective in the prevention of zoonotic diseases in humans; (iv) the Court's establishment of specific requirements supplemental to FDA regulations for Merial to follow in marketing and

distribution of the product and in reporting to the FDA regarding the product's efficacy; and (v) the Court's appointment of an independent monitor to review Merial's marketing campaigns of the product.

Plaintiffs have also requested actual damages for (1) the prices paid by Plaintiffs to purchase HeartGard and HeartGard Plus since the inception of the false advertisements and false promotional materials; (2) the costs incurred by Plaintiffs resulting from the failures of HeartGard and HeartGard Plus; (3) the amounts by which Merial has been unjustly enriched at Plaintiffs' expense by false and fraudulent advertising and promotional claims of excessive efficacy of the product; (4) divestiture of any and all of Merial's interest in the enterprise; (5) treble damages, costs, and attorney's fees and expenses; and (6) divestiture of all proceeds received from the sale of HeartGard and/or HeartGard Plus for dogs to the extent to which Merial has been unjustly enriched at Plaintiffs' expense. Plaintiffs additionally seek punitive and exemplary damages and any other legal or equitable relief deemed just under the circumstances.

Plaintiffs' request of both monetary and injunctive relief in this case is not in and of itself fatal to Rule 23(b)(2) class certification.[7] However, Rule 23(b)(2) class certification would not be proper in this case, because Plaintiffs fail to demonstrate that the injunctive relief they request predominates over any monetary damages sought. The Fifth Circuit has held that any requested "[m]onetary relief predominates unless it is 'incidental' to the requested injunctive or declaratory relief." *Casa Orlando Apartments*, 624 F.3d at 199 (citing *Allison*, 151 F.3d at 415). The Fifth Circuit has defined "incidental" to mean "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief" and has explained that "[s]uch incidental damages should only be those to which class members would be

---

[7] The Court notes that the Advisory Committee's note to Rule 23(b)(2) cites no cases containing requests for both monetary and injunctive relief as examples of Rule 23(b)(2) classes. *See* FED. R. CIV. P. 23(b)(2) advisory committee's note, 39 F.R.D. 69, 102 (1966) (citing cases); *Dukes*, 131 S. Ct. at 2558.

automatically entitled once liability to the class is established." *Id.* (citing *Allison*, 151 F.3d at 415). The Fifth Circuit has also explained that "damages may be incidental when they are 'capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Bolin*, 231 F.3d at 976. Plaintiffs request monetary relief based on prices the Plaintiffs paid to purchase HeartGard or HeartGard Plus from their respective veterinarians, the costs the Plaintiffs have incurred in treating their respective dogs for heartworms and otherwise resulting from the failures of HeartGard or HeartGard Plus, the amounts by which Merial has been unjustly enriched by false claims of the efficacy of HeartGard or HeartGard Plus, and other damages. The Court finds that the Plaintiffs' requested monetary relief would not flow from the injunctive relief requested, including permanent injunctions against Merial relating to the marketing of HeartGard and HeartGard Plus as 100% effective at preventing heartworms and as 100% effective at preventing the transmission of zoonotic disease in humans, the Court's establishment of more stringent requirements for the marketing of HeartGard and HeartGard Plus and taking on a more active role in the marketing and promotion of HeartGard and HeartGard Plus in general. Instead of flowing from the injunctive relief requested, the monetary relief requested would depend on the specific circumstances of each class member relating to the amount each Plaintiff was charged for HeartGard and/or HeartGard Plus. The retail prices paid by Plaintiffs for HeartGard and HeartGard Plus apparently are not determined by Merial but by the veterinarians who sell the products to consumers. The computation of monetary relief to the Plaintiffs would likely "entail complex individualized determinations," which are not characteristic of "incidental damage." *See Allison*, 151 F.3d at 415. Such individual considerations belie the fact that

injunctive relief would be proper, because Plaintiffs have failed to demonstrate that the injunctive relief would predominate over any monetary relief requested.

Of further concern to the Court is the nature of the injunctive relief requested by the Plaintiffs, which would entail policing the marketing and promotion of HeartGard and HeartGard Plus and imposing more stringent regulations than the FDA. The FDA has warned Merial that its advertisement and promotion of HeartGard and HeartGard Plus as 100% effective at preventing heartworms and as preventing the transmission of zoonotic diseases from animals to humans was not in compliance with federal law. The FDA has policed the matter, and continues to do so, and it is not this Court's office to usurp the FDA's expertise in such matters. It is apparent to this Court that because the FDA continues to regulate the advertising and promotion of HeartGard and HeartGard Plus, the majority of the putative class members will not face future harm and thus will not receive any benefit from injunctive relief. *See Maldonado*, 493 F.3d at 525 ("Rule 23(b)(2) certification is also inappropriate when the majority of the class does not face future harm."); *In re Monumental Life*, 365 F.3d 408, 416 (5th Cir. 2004) ("[C]ertification under [R]ule 23(b)(2) is appropriate only if members of the proposed class would benefit from the injunctive relief they request."). Therefore, "[t]hese [P]laintiffs have nothing to gain from an injunction, and the declaratory relief they seek serves only to facilitate the award of damages. Thus, the definition of the class shows that most of the plaintiffs are seeking only damages." *See Bolin*, 231 F.3d at 978. The Court is left to wonder how it could define or enforce meaningful injunctive relief in light of these concerns.[8] For these reasons, the Court finds that Rule 23(b)(2) certification is not warranted in this case.

---

[8] Merial also argues that Plaintiffs' claim for injunctive relief is moot because Merial has already ceased claiming in advertising and promotional material that HeartGard Plus is 100% effective at heartworm prevention. The Court finds this argument is not well taken. Although federal courts do not decide cases in which the courts can provide no meaningful relief due to mootness, "as long as the parties have a concrete interest, however small, in the

### Rule 23(b)(3) Certification

Plaintiffs also maintain that class certification is proper under Rule 23(b)(3). Rule 23(b)(3) provides that class certification is proper only when "[1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . [2] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).[9] When the Court makes the Rule 23(b)(3) determination, it focuses not on adjudicating the case but on "select[ing] the metho[d] best suited to adjudication of the controversy fairly and efficiently." *See Amgen, Inc. v. Conn. Retirement Plans & Trust Funds*, ___ U.S. ___, ___ S. Ct. ___, 2013 WL 691001, at *3 (Feb. 27, 2013). The Court will first examine the predominance prong and then will examine the superiority prong in the Rule 23(b)(3) analysis.

### (1) Predominance

"Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Id.* at *4. This inquiry requires the Court to consider "how a trial on the merits would be conducted if a class were certified." *See Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011)

---

outcome of the litigation, the case is not moot." *See Ellis v. Ry. Clerks*, 466 U.S. 435, 442, 104 S. Ct. 1883, 80 L. Ed. 2d 428 (1984). Further, although Merial may be in compliance with FDA requirements at present, and thus may have ceased any offensive activity, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," unless the party asserting mootness meets its "heavy burden of persuad[ing] the court" that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (internal citations and quotation marks omitted). The Court finds that Merial has not met this heavy burden. However, Rule 23(b)(2) class certification is not warranted on other grounds, as set forth in this opinion.

[9] The Court notes the overlap between Rule 23(a)(2)'s commonality requirement and the predominance and superiority requirements of Rule 23(b)(3). The commonality requirement is "subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions." *See Amchem Prods.*, 521 U.S. at 609, 117 S. Ct. 2231; *see also O'Sullivan*, 319 F.3d at 737 (predominance and superiority requirements of Rule 23(b)(3) are "far more demanding" than Rule 23(a)(2)'s commonality requirement).

(internal citation omitted). Accordingly, the Court must identify the substantive issues that will control the outcome, assess which issues will predominate, and then determine whether the issues are common to the class. *See In re Wilborn*, 609 F.3d at 755. This entails an examination of the "elements of the underlying cause of action." *See Erica P. John Fund, Inc. v. Halliburton Co.*, ___ U.S. ___, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (June 6, 2011).

With the foregoing standard in mind, the Court will first lay out the elements of Plaintiffs' claims and what must be shown to prove a RICO violation in a class action context, and will then examine whether issues common to the class will predominate.

### (i)   Substantive Issues

Although a plaintiff can bring a civil RICO suit under 18 U.S.C. § 1964(c), it must first establish standing to do so. *See Beck v. Prupis*, 529 U.S. 494, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000); *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425 (5th Cir. 2000). To establish standing, the plaintiff must show (1) injury to property and (2) causation. *Price*, 138 F.3d at 606. After the plaintiff establishes standing, it must then satisfy the elements of a RICO violation under Section 1962, that is, the plaintiff must show that there is "(1) a <u>person</u> who engages in (2) a <u>pattern of racketeering activity</u> (3) connected to the acquisition, establishment, conduct, or control of an <u>enterprise</u>.' " *St. Paul Mercury*, 224 F.3d at 439 (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988)).

Plaintiffs bring this RICO action against Merial under 18 U.S.C. § 1962(c),[10] which prohibits any person employed by or associated with any enterprise from participating in or

---

[10] Plaintiffs appear to have abandoned their additional, earlier-pled RICO claims for Merial's alleged use of the income it received from the sales of the product or by Merial's alleged investment of the income it received from the sales of the product in violation of 18 U.S.C. § 1962(a); Merial's alleged acquisition of the income it received from the sales of the product in violation of 18 U.S.C. § 1962(b); and Merial's alleged participation in a conspiracy to commit RICO violations in violation of 18 U.S.C. § 1962(d). Thus, the Court cabins its analysis to Plaintiffs' RICO claim under Section 1962(c).

conducting the affairs of that enterprise through a pattern of racketeering activity. Plaintiffs'
RICO claim is based on the theory that Plaintiffs and the putative class members were injured by
Merial's participation in an enterprise through a pattern of racketeering activity that constituted
mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343
against the American veterinarian community and dog owners when it advertised and promoted
HeartGard and HeartGard Plus as 100% effective against heartworm prevention and against the
transmission of certain zoonotic diseases to humans.

Plaintiffs specifically allege that Merial was an enterprise, that is, "an association in fact
that includes Merial and third parties such as [I]nternet providers, the American Heartworm
Society, and veterinarians," which "falsely represented the attributes and efficacy" of HeartGard
and HeartGard Plus to consumers. Pls.' Br. Supp. Mot. Class Certification [249] at 30–31.
Plaintiffs aver that the enterprise shared the common purpose of misleading the American
veterinarian community and American dog owners with false and fraudulent claims of the
efficacy of HeartGard and HeartGard Plus in order to capture the lion's share of Internet sales of
heartworm preventatives and to be the overall number-one choice in the market for heartworm
prevention. Plaintiffs further allege that Merial committed predicate acts of fraud consisting of
false claims in advertising and promotional materials that HeartGard and HeartGard Plus were
100% effective at preventing heartworms and the transmission of certain zoonotic diseases from
dogs to humans. Plaintiffs claim that each "click" on the Internet constitutes a separate predicate
act. Plaintiffs aver that Merial's marketing materials were transmitted to veterinarians directly
and/or indirectly by the use of the United States mail service and/or the Internet. Plaintiffs allege
that veterinarians throughout the United States relied on Merial's alleged false claims of 100%
efficacy, and prescribed HeartGard and HeartGard Plus to a multitude of dogs to prevent

24

heartworm disease in the dogs. Plaintiffs further allege that they, and others in the putative class, relied on their veterinarians' recommendations and purchased HeartGard and/or HeartGard Plus at an inflated market price. Finally, Plaintiffs allege that although the FDA warned Merial that its 100% efficacy claims were false, Merial failed to take appropriate action to cease dissemination of the materials as demanded by the FDA, thus allowing the impression to remain with veterinarians and the consuming public that HeartGard and HeartGard Plus were 100% effective at prevention heartworms and the transmission of certain zoonotic diseases to humans.

### (ii) **Which Issues Will Predominate and Whether Such Issues Are Common to Class**

The Court will now assess which issues will predominate, and then determine whether the issues are common to the class. In so doing, the Court will analyze and balance the common issues against the individualized issues, and consider the administration of a trial on the merits.

Plaintiffs argue that the predominant issues in this case are the same for all class members: that is, Merial's alleged violations of RICO, the FDCA, federal mail fraud statutes, and federal wire fraud statutes. Plaintiffs maintain that the specific questions raised in the case which are common to class members are the following:

> **(1)** Has Merial engaged in a pattern of racketeering activity?
> **(2)** Has Merial engaged in RICO "predicate acts" by using the mail and wire to disseminate false and misleading advertisements?
> **(3)** Did Merial market HeartGard as 100[%] effective while knowing this claim was false?
> **(4)** Did Merial receive and retain monies due to false and misleading statements contained within its marketing materials?
> **(5)** Did Merial continue to disseminate deceptive marketing information to class members after being told by the FDA to cease dissemination of such materials?
> **(6)** Has Merial conducted or participated in a RICO enterprise?

(7) Has Merial's pattern of racketeering activity, through its false marketing campaign, injured class members, including the named [P]laintiffs, in their "business or property"?
(8) Have Merial's deceptive practices caused class members to pay more for HeartGard despite it not providing any more protection against heartworm disease than less expensive competing products?
(9) What injunctive or declaratory relief is required to enjoin and otherwise remedy Merial's false marketing of HeartGard?

Plaintiffs' Supp. Br. Supp. Mot. Class Certification [335] at 4. Plaintiffs maintain that common issues predominate in this case because Plaintiffs' claim focuses on facts and issues common to Merial's alleged behavior rather than on facts and issues specific to individual class members. Plaintiffs assert that the putative class will be able to rely on common evidence at trial, including the same documents and testimony, to prove that Merial's conduct has violated RICO. Plaintiffs maintain that testimonial and documentary evidence concerning the existence of an enterprise will be common among the putative class members. Plaintiffs also maintain that the proof concerning the knowing commission of predicate acts would be common among the putative class members. Plaintiffs further contend that evidence concerning a pattern of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 would be based on common proof that would overlap with proof of the existence of an enterprise. Merial argues that although some of the elements of the RICO claim might be substantiated with common proof, individualized proof would be required to show injury and causation, and that the individualized issues present would predominate over any common issues in the case.

The issues Plaintiffs list are "common" in that each purported Plaintiff would need the questions answered, and indeed, several questions with respect to the elements of the RICO claim are common to the class, such as evidence concerning Merial's particular actions with respect to advertising and promotion of HeartGard and HeartGard Plus, the alleged existence of

26

an enterprise, any alleged participation by Merial in the alleged enterprise, etc. However, many of the integral questions in the case cannot be determined on a class-wide basis using class-wide proof, specifically those concerning whether Merial's alleged pattern of racketeering activity through its alleged marketing campaign has injured class members in their business or property, whether Merial's alleged deceptive practices have caused putative class members to pay more for HeartGard or HeartGard Plus despite it not providing any more protection against heartworms than its less expensive competing drugs, and what relief is appropriate. These questions pertaining to injury, causation, and damages must be proven in order for Plaintiffs to recover in this RICO action, and a determination at a trial on the merits would require the fact-finder to engage in a determination of the facts and circumstances present in each Plaintiff's case, as more fully explained below. Thus, there are individualized issues present in this case that predominate over any common issues, making Rule 23(b)(3) class certification untenable.

(a) **Injury**

Plaintiffs maintain that the questions are common to the class concerning whether the named Plaintiffs and members of the putative class have suffered injury to their business or property by paying more for HeartGard or HeartGard Plus, despite it not providing any more protection against heartworm disease than less expensive competing products. Plaintiffs contend that these questions are focused on Merial's alleged behavior, which Plaintiffs allege has affected all the named Plaintiffs and putative class members by causing them to overpay for HeartGard and HeartGard Plus.

Merial argues that only individualized proof will ultimately prove injury of overpayment for HeartGard and HeartGard Plus by demonstrating the existence and amount of overpayment. Merial contends that additional individualized factual concerns with respect to proof of injury

include, *inter alia*, the following: the alternative heartworm preventative the veterinarian would have prescribed is left to the veterinarian's independent medical judgment; the retail price paid by the owners varies from veterinarian to veterinarian; the prices of HeartGard and HeartGard Plus and its competitors changes over time; and some or all of the putative class members may have received the benefit of their bargain. Merial contends that these individualized factual concerns require individualized proof that would be fatal to Rule 23(b)(3) class certification.

The Court finds Merial's arguments in this respect to be well taken. Individualized issues exist with respect to proof of injury, and those issues, along with the individualized issues with respect to proof of causation and damages, predominate over any questions common to the class and make Rule 23(b)(3) class certification untenable in this case.

### (b) Causation

Merial argues that the class should not be certified because the individualized proof required to prove proximate cause in the RICO claim predominates over any common questions of law or fact.[11] Merial contends that Plaintiffs have alleged proximate cause through first-party reliance when they allege in the amended complaint that dog owners who purchased HeartGard and/or HeartGard Plus did so in reliance on Merial's 100% efficacy claims in advertising and promotional items for the drug, and that first-party reliance would require proof that each individual Plaintiff relied on the alleged misrepresentation. Merial further contends that

---

[11] Merial also argues that Plaintiffs have attempted to assert a "fraud on the market" theory of recovery in order to avoid having to prove reliance, but that fraud on the market is not tenable in RICO litigation. Plaintiffs respond that their excess price theory is not based on a "fraud on the market" theory. Although the Court is satisfied that Plaintiffs do not appear to be attempting to assert a "fraud on the market" theory, the Court notes the following. Although there is a built-in presumption of reliance in "fraud on the market" theories of recovery, those theories are available in the context of securities litigation—not in RICO litigation. *See Amgen, Inc.*, 2013 WL 691001, at *5 ("fraud-on-the-market theory . . . facilitates class certification by recognizing a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market"); *Summit Props. Inc. v. Hoeschst Celanese Corp.*, 214 F.3d 556, 561 (5th Cir. 2000) ( "[n]o court has accepted the use of this theory outside of the context of securities fraud"). Because the "fraud on the market" theory is cognizable only in the context of securities litigation, the theory cannot be used to prove causation in a RICO action.

28

Plaintiffs plead third-party reliance when they allege in their amended complaint that veterinarians relied upon Merial's 100% efficacy claims in making the decision to prescribe HeartGard or HeartGard Plus over other heartworm preventative drugs, and that third-party reliance would require proof that each individual veterinarian relied on the alleged misrepresentation.

Plaintiffs maintain that common proof is all that is needed to substantiate causation in this case. Plaintiffs contend that common questions pertaining to causation which lend themselves to common proof include the following:

> Has Merial's pattern of racketeering activity, through its false marketing campaign, injured class members, including the named [P]laintiffs, in their "business or property"?
>
> Have Merial's deceptive practices caused class members to pay more for HeartGard despite it not providing any more protection against heartworm disease than less expensive competing products?

Plaintiffs maintain that they will offer common proof to support the allegations that Merial's deceptive marketing scheme has caused injury by increasing the price of HeartGard and HeartGard Plus to all putative class members. Plaintiffs specifically contend that they will introduce documents and testimony that Merial knowingly and falsely claimed HeartGard and HeartGard Plus were 100% effective against heartworms and in the prevention of zoonotic diseases. Plaintiffs cite potential witnesses who Plaintiffs maintain would testify concerning Merial's alleged participation in a scheme to defraud and the alleged resulting increased retail price paid by its purchasers. Plaintiffs further maintain that they will rely on marketing data, including data related to wholesale and retail pricing, competitor pricing, and market share data as common proof of the alleged scheme to defraud and resulting overpayment by the members of the putative class. Plaintiffs maintain that they are not required to present individualized proof of

reliance on any alleged misrepresentation to recover under RICO, based in part on the recent

United States Supreme Court decision *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661,

128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008).

In 2008, the Supreme Court held in *Bridge* that "a plaintiff asserting a RICO claim

predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to

establishing proximate causation, that <u>it</u> relied on the defendant's alleged misrepresentation."

*See Bridge*, 553 U.S. at 661, 128 S. Ct. 2131 (emphasis added). In *Bridge*, respondents had filed

RICO claims arising out of the petitioners' alleged misrepresentations to Cook County, Illinois

officials in connection with Cook County's auction to sell its tax liens on delinquent taxpayers'

property. Respondents and petitioners were competitors in the tax lien auction. Respondents

argued that petitioners' misrepresentations had allowed them to gain an advantage over

respondents in the auction; namely, respondents alleged that as a result of petitioners' fraud

respondents had lost valuable liens they otherwise would have been awarded. Petitioners argued

that respondents' RICO claim failed because respondents could not establish first-party reliance

to state a mail-fraud-based RICO claim, as the misrepresentations at issue were made to Cook

County, not to respondents.

Justice Thomas wrote for the unanimous Court:

> If petitioners' proposed requirement of first-party reliance
> seems to come out of nowhere, there is a reason: Nothing on the
> face of the relevant statutory provisions imposes such a
> requirement. Using the mail to execute or attempt to execute a
> scheme to defraud is indictable as mail fraud, and hence a
> predicate act of racketeering under RICO, even if no one relied on
> any misrepresentation.

*Id.* at 648, 128 S. Ct. 2131. The Court found nothing in the statutory provisions required a

showing of "justifiable reliance" in a RICO claim, even though "justifiable reliance" is a

common-law requirement of a fraud claim. *Id.* at 648–49, 128 S. Ct. 2131; RESTATEMENT

(SECOND) OF TORTS § 537 (1977). The Court stated that first-party reliance has no place in civil

RICO actions predicated on mail, wire, or bank fraud. The Court found that accepting

respondents' allegations as true, the petitioners clearly were injured by respondents' scheme

"even though [respondents] did not rely on petitioners' false attestations of compliance with the

county's rules." *Id.* at 649, 128 S. Ct. 2131. The Court further found that "a person can be

injured 'by reason of' a pattern of mail fraud even if he has not relied on any

misrepresentations." *Id.*, 128 S. Ct. 2131. The Court further explained:

> Respondents' alleged injury—the loss of valuable liens—is the
> direct result of petitioners' fraud. It was a foreseeable and natural
> consequence of petitioners' scheme to obtain more liens for
> themselves that other bidders would obtain fewer liens. And . . .
> there are no independent factors that account for respondents'
> injury, there is no risk of duplicative recoveries by respondents
> removed at different levels of injury from the violation, and no
> more immediate victim is better situated to sue. Indeed, both the
> District Court and the Court of Appeals concluded that respondents
> and other losing bidders were the <u>only</u> parties injured by
> petitioners' misrepresentations.

*Id.* at 658, 128 S. Ct. 2131.

The Supreme Court provided an additional example of a case wherein third-party reliance

would cognizably satisfy causation in a RICO action: "[S]uppose an enterprise that wants to get

rid of rival businesses mails misrepresentations about them to their customers and suppliers, but

not to the rivals themselves. If the rival businesses lose money as a result of the

misrepresentations, it would certainly seem that they were injured in their business 'by reason of'

a pattern of mail fraud, even though they never received, and therefore never relied on, the

fraudulent mailings." *Id.* at 649–50, 128 S. Ct. 2131.

31

Prior to the *Bridge* decision, the Fifth Circuit had held that RICO plaintiffs generally were required to prove individual reliance on the defendant's misrepresentation to satisfy causation on their RICO claim, and that this required individualized proof would defeat class certification under Rule 23(b)(3) because individualized issues would predominate. *See, e.g.,* *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.,* 319 F.3d 205, 219 (5th Cir. 2003) ("The pervasive issues of individual reliance that generally exist in RICO fraud actions create a working presumption against class certification."); *Patterson v. Mobil Oil Corp.,* 241 F.3d 417, 419 (5th Cir. 2001) ("Claims for money damages in which individual reliance is an element are poor candidates for class treatment, at best. We have made that plain."); *Bolin,* 231 F.3d at 978 ("the individual findings of reliance necessary to establish RICO liability and damages preclude not only [Rule 23](b)(2) certification of this class under RICO, but [Rule 23](b)(3) certification as well"). However, even pre-*Bridge*, the Fifth Circuit had recognized a "narrow exception to the requirement that the plaintiff prove direct reliance on the defendant's fraudulent predicate act . . . when the plaintiff can demonstrate injury as a direct and contemporaneous result of fraud committed against a third party." *See Sandwich Chef,* 319 F.3d at 223 (citing generally *Summit Props. Inc. v. Hoechst Celanese Corp.,* 214 F.3d 556 (5th Cir. 2000); *Procter & Gamble Co. v. Amway Corp.,* 242 F.3d 539 (5th Cir. 2001)).

Although the Supreme Court's holding in *Bridge* did alter the general perception of whether causation in a RICO claim required a showing of individual reliance, the *Bridge* holding did **not** shift the ultimate focus of RICO causation, which was, and **still is**, on "whether the alleged violation led directly to the plaintiff's injuries." *See Bridge,* 553 U.S. at 654, 661, 128 S. Ct. 2131 (citing *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006)). Although causation in RICO need not be demonstrated by reliance on a

misrepresentation, Justice Thomas wrote for the unanimous Court: "Of course, none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud **can** prevail without showing that someone relied on the defendant's misrepresentations. In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." *Id.* at 658, 128 S. Ct. 2131 (citation omitted; emphasis added). A "complete absence of reliance may prevent the plaintiff from establishing proximate cause.  . . . Accordingly, it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Id.* at 658–59, 128 S. Ct. 2131.

There have been no Fifth Circuit decisions regarding class certifications in RICO context since *Bridge*. However, case law does provide direction for navigating the waters post-*Bridge*. In *St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009) (per curiam), the Fifth Circuit held that the district court erred in requiring plaintiffs "to demonstrate detrimental reliance when alleging injuries that resulted from fraud under RICO," and in so doing, "the district court relied on Fifth Circuit precedent that is no longer good law." 556 F.3d at 263. The Fifth Circuit further stated: "The Supreme Court recently held that no reliance requirement exists for civil causes of action under RICO for victims of mail fraud. . . . Thus, to the extent that our prior cases are in conflict with *Bridge*, they are overruled." *Id.* And the United States District Court for the Southern District of Mississippi has indicated that "class certification may now be appropriate where, as in *Bridge*, causation is alleged through third-party reliance by a single entity . . . and reliance would not need to be individually determined for each class member." *See Warnock v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 1113475 (S.D. Miss. Mar. 24, 2011).

33

In the case *sub judice*, proof of causation at trial will involve evidence showing that Merial's alleged RICO violation led directly to the Plaintiffs' injuries of overpayment for HeartGard or HeartGard Plus, even though the drug was no more effective than its competitors. Even if Plaintiffs were able to demonstrate that Merial participated in a deceptive marketing scheme, to prove that Merial's participation in the deceptive marketing scheme caused injury by increasing the price of HeartGard and HeartGard Plus to all putative class members would likely require the fact finder to examine the prices paid by each individual putative class member for the drug and to examine other individualized factors to determine if Merial's participation in the deceptive marketing scheme directly led to any overpayment of the drug.

Merial apparently sells HeartGard and HeartGard Plus wholesale to veterinarian clinics; this wholesale price varies over time and is sometimes discounted by Merial. Each veterinarian clinic apparently sets the retail price of HeartGard and HeartGard Plus by marking up the wholesale price. The purchase price of the drugs is thus likely to vary significantly across geographic markets and the Internet. As a further complication, some veterinarians and some websites also feature discounts and special deals that others do not. The purchase price also varies depending on the drug's dosage, which is in turn dependent on the weight of the particular dog which often fluctuates over time. The circumstances surrounding the purchase prices paid by Plaintiffs for HeartGard and/or HeartGard Plus would require an individual assessment of the claim of each particular Plaintiff.

Also involved in this determination would be considerations concerning the medical judgment of the veterinarians who prescribed HeartGard or HeartGard Plus over other heartworm preventatives to each particular dog. These considerations would entail individualized proof, because Plaintiffs have alleged misrepresentations regarding the

pharmaceutical's safety and efficacy. Some of the possible considerations involved in prescribing one drug over another include the diagnosis, past and current medications, the prescriber's own experience with the drug, the prescriber's knowledge regarding the drug's side effects, the dosage form, specific product taste, product cost, manufacturer differences affecting the product including history and years of market experience, and the attributes of the particular dog. These factors cannot be shown by common proof alone.

The individualized issues concerning causation, as well as injury and damages, predominate over any common issues, as is further illustrated by the following examination of what evidence could show damages at trial.

### (c) **Damages**

Merial argues that a trial on the merits would require individualized proof of damages. Plaintiffs claim that this argument is unavailing, because the presence of individualized damages issues does not prevent a finding that common issues predominate. Plaintiffs contend that they will rely on testimony and other common proof to establish damages for each putative class member. Plaintiffs maintain that they will present testimony from Dr. Peter Rost, former Vice President of Marketing with Pfizer, demonstrating that HeartGard Plus is worth $1.50 to $2.50 less than charged, and that Plaintiffs do not seek damages based on the differences in price between HeartGard and/or HeartGard Plus and generics. *See* Pls.' Suppl. Br. Supp. Mot. Certify Class [335] at 16. Plaintiffs characterize the basis for their claim for damages as "their overpayment for a product **worth less** than its inflated price at $1.50 to $2.50 per dose as a result of Merial's **uniform misrepresentations**." *See* Pls.' Reply Supp. Mot. Certify Class [265] at 10.

Although the Court does not exclusively rely on the method of damages proof in reaching its conclusion that Rule 23(b)(3) class certification would be inappropriate, the Court finds that it

is clear that determining the amount of damages for each putative class member would require individualized determinations with respect to each Plaintiff. The determination of damages would require the fact-finder to determine, *inter alia*, the calculation of damages, based on the prices paid by each individual Plaintiff to his or her respective veterinarian to purchase HeartGard and/or HeartGard Plus. The circumstances of the purchase prices charged may vary from Plaintiff to Plaintiff and illustrate the many underlying individual circumstances that would need to be considered. All of these individual inquiries would be part of the overall determination of any damages incurred as a result of Merial's alleged RICO violations.

The Fifth Circuit has held that the necessity of calculating damages on an individual basis, by itself, <u>can</u> be grounds for not certifying a class. *See Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 297 (5th Cir. 2004) (citing *Bell Atlantic Corp. v. AT & T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003), *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 745 (5th Cir. 2003), and *Allison*, 151 F.3d at 419)); *see also In re Wilborn*, 609 F.3d at 755 (finding plaintiffs' claims failed under the predominance and superiority inquiries because "individual issues for each class member, particularly with respect to damages, override class concerns when we consider how the case must be tried").

Although this Court finds that individualized proof would be required to substantiate the Plaintiffs' damages in the case *sub judice*, the Court also finds that individualized proof would be required on many of the integral issues with respect to injury and causation, and that all of these individual questions would predominate over any questions common to the class.

## (2) <u>Superiority</u>

The Court now turns to whether the class action vehicle would be the superior method of adjudication in the case *sub judice*. Plaintiffs of course maintain that class adjudication of their

36

RICO action is the superior method of adjudication, due to the complexity of RICO and the unrealistic alternative of a proliferation of individual lawsuits against Merial for deceptive marketing of HeartGard and HeartGard Plus. Plaintiffs contend that individual recoveries would be likely to be in the hundreds of dollars or less, making it economically unattractive for attorneys to take the risk of litigating individual cases that would require enormous effort and large expert witness fees. The Court is sympathetic to Plaintiffs' concerns, but cannot conclude that a class action would be the superior method for adjudicating this case, due to the vast amount of individualized proof that would be required at a trial on the merits. The presence of these individual issues indicates that a class action would be unmanageable and thus an inferior method of adjudication in this case. *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604–05 (5th Cir. 2008); *Allison*, 151 F.3d at 419. For all the foregoing reasons, the Court finds that class certification is not warranted under Rule 23(b)(3).

## *E. Conclusion*

In sum, the Court finds, after conducting a rigorous analysis of the requirements of Rule 23, that class certification is inappropriate under both Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. The requested injunctive relief would not remedy the putative class, thus foreclosing class certification under Rule 23(b)(2). Further, the individual issues of class members pertaining to injury, causation, and damages would predominate over any issues common to the class, and would make a class action not the superior method of adjudicating the case, thus foreclosing class certification under Rule 23(b)(3).

37

ACCORDINGLY, the Court finds that Plaintiffs' motion for class certification [248] should be DENIED.

An order in accordance with this opinion shall issue this day.

THIS, the 1st day of April, 2013.

_____
SENIOR JUDGE